**RHONE POULENC, S.A., and Rhone Poulenc, Inc., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant,**

**and**

**PQ Corporation, Defendant-Intervenor.**

Court No. 81-1-00079.

United States Court of International Trade.

July 19, 1984.

Donohue & Donohue, Joseph F. Donohue, James A. Geraghty, and John M. Peterson, New York City, for plaintiffs.

Richard K. Willard, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch; Sheila N. Ziff, U.S. Dept. of Justice, Washington, D.C., for defendant.

Warren Maruyama, U.S. Intern. Trade Com'n, Washington, D.C., for defendant.

Mandel & Grunfeld, Bruce M. Mitchell and Steven R. Sosnov, New York City, for defendant-intervenor.

## OPINION AND ORDER

RESTANI, Judge.

Plaintiffs, Rhone Poulenc, S.A., and Rhone Poulenc, Inc., ("Rhone Poulenc")[1] challenge the final determination of the United States International Trade Commission ("ITC" or "Commission"), pursuant to 19 U.S.C. § 1673d(b)(i)(A)(ii) (1982) that an industry in the United States is threatened with material injury by reason of imports of anhydrous sodium metasilicate (ASM)

---

1. Unless otherwise noted, both plaintiffs will be referred to as Rhone Poulenc.

from France,[2] and the determination of the United States International Trade Administration, Department of Commerce ("ITA") of sales at Less Than Fair Value ("LTFV") pursuant to 19 U.S.C. § 1673d(a) (1982).[3] This matter is before the court pursuant to plaintiffs' motion for review of administrative determinations upon the agency record under Rule 56.1.

Plaintiffs raise the following issues:

(1) Whether the Commission's determination that a United States industry is threatened with material injury is supported by substantial evidence and is otherwise in accordance with law, particularly:

(a) whether the Commission erred by failing to consider factors applicable to a finding of present material injury, specifically:

(1) import volume,

(2) effects of imports upon domestic prices, and

(3) impact of French ASM imports on the domestic ASM industry;

(b) whether the Commission improperly aggregated data in assessing injury to an industry;

(c) whether the Commission's consideration of developments in the Northeast market constituted a proper industry analysis;

(d) whether the Commission's consideration of developments in the commercial package market is appropriate and in accordance with law;

(e) whether the concurring opinion of a Commissioner was based upon speculation and conjecture and; [4]

(2) whether the ITA's disallowance of plaintiffs' claim for an adjustment to foreign market value is supported by substantial evidence and is in accordance with law. More specifically, plaintiffs challenge the disallowance of technical services expenses as a circumstances of sale adjustment to foreign market value and further, any limitation of the exporter's sales price offset adjustment because of a lower level of sales expenses in the United States than in the foreign market.

## Background

ASM is a sodium silicate manufactured for use as an alkali source [5] in detergent formulations. The largest importer of ASM is Rhone Poulenc, Inc. of Monmouth, New Jersey, which is a wholly owned subsidiary of the French producer and exporter, Rhone Poulenc, S.A., of Paris, France.

There are only four United States manufacturers of ASM. They are PQ Corporation ("PQ") of Valley Forge, Pennsylvania; [6] Stauffer Chemical Company of Joliet, Illinois, Diamond Shamrock Corporation of Dallas, Texas, and Mayo Products Company, Division of Pennwalt Corporation of Smyrna, Georgia. These companies were found to produce ASM "like" the ASM imported by Rhone Poulenc, Inc.[7] Furthermore, these companies were found to constitute the domestic industry against which the impact of less than fair value (LTFV) sales should be measured.[8]

2. The disputed final determination of the ITC was published on January 2, 1981 and is found at 46 Fed.Reg. 176. This determination was based upon the record developed in investigation No. 731–TA–25 (Final).

3. The disputed final determination of the ITA was published on November 24, 1980 and is found at 45 Fed.Reg. 77498.

4. We need not reach this issue. A defect in the opinion of one Commissioner will not affect the viability of the majority determination where the proper number of Commissioners have participated. *Cf. Voss International Corp. v. United States,* 78 Cust.Ct. 130, 432 F.Supp. 205 (1977), *aff'd in part, and rev'd in part on other grounds,* 67 CCPA 96, 628 F.2d 1328 (1980).

5. Alkali is one of the primary cleaning components in a detergent.

6. PQ is intervenor herein.

7. Section 771(10), Tariff Act of 1930, as amended, 19 U.S.C. § 1677(10) (1982) provides:

The term "like product" means a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this subtitle.

8. Section 771(4), Tariff Act of 1930, as amended, 19 U.S.C. § 1677(4)(A) (1982) provides:

The term "industry" means the domestic producers as a whole of a like product, or those

Each United States ASM producer is vertically integrated. Each produces, in varying degrees, ASM for its own "captive" consumption in the manufacture of detergents. At the same time, each sells ASM in the so-called "commercial" market to other detergent manufacturers who use ASM in the production of independently-labeled detergents.

ASM is sold commercially in two forms. The "bulk" market consists of large volume consumers who take delivery in railway hopper cars or in 2,000 pound sacks. The "package" market consists of smaller quantity consumers.[9] Packaged ASM is shipped in 100-pound sacks or 400-pound drums, and accounts for approximately two-thirds of the commercial market. During the relevant period,[10] ASM imports were sold exclusively in the "package" market.

The ASM industry possesses a few salient features which are notable. First, ASM, a fungible product, is highly price sensitive. Second, the production machinery used to manufacture ASM must be operated continuously, twenty-four hours a day, seven days a week, as profitability falls rapidly when capacity utilization declines. Third, there is decreasing demand for ASM in the United States market, and the foreign producer has capacity for increased production or for diverting production to the United States.

## Opinion

█ Although it is well established that the administrative construction of a statute by the agency charged with its administration is entitled to great weight, *Melamine Chemicals, Inc. v. United States*, 732 F.2d 924 (Fed.Cir.1984) (citing *Zenith Radio Corp. v. United States*, 437 U.S. 443, 98 S.Ct. 2441, 57 L.Ed.2d 337 (1978)); *Udall v. Tallman*, 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1964); *Selman v. United States*, 498 F.2d 1354, 1356 (1974); *Freeport Minerals Company v. United States*, 7 C.I.T. ——, ——————, 590 F.Supp. 1246 (1984), the determination at issue must be supported by substantial evidence on the record and may not be contrary to law. *See* 19 U.S.C. § 1516a(b)(1)(B) (1982); *Armstrong Bros. Tool Co. v. United States (Daido Corporation, Steelcraft Tools Division, Party-in-Interest)*, 84 Cust.Ct. 16, 483 F.Supp. 312 (1980), *aff'd*, 67 CCPA 94, 626 F.2d 168 (1980), and cases cited therein; *accord Alberta Gas Chemicals, Inc. v. United States*, 1 C.I.T. 312, 321, 515 F.Supp. 780, 789 (1981); *see also American Spring Wire Corporation v. United States*, —— C.I.T. ——, ——, 590 F.Supp. 1273 (1984) and cases cited therein; *Southwest Florida Winter Vegetable Growers Association v. United States*, 7 C.I.T. ——, 584 F.Supp. 10 (1984) (citing *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938) (Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion")).

## Threat of Material Injury

The concept of "threat of material injury" arises in an area of the law which is, needless to say, far from "cut and dry." *See Bethlehem Steel Corp. v. United States*, —— C.I.T. ——, ——, 590 F.Supp. 1237 (1984) ("... these are the early days of sophisticated interpretation, despite the long history of such laws ....").

█ The parties disagree over the threat of injury standard. Their disagreement centers around plaintiffs' position that the ITC and the court must look to the economic indicators of injury specified in the present injury standard in order to determine threat of injury. Defendants argue that there is no need to consider the material injury standard, but rather, that the

whose collective output of the like product constitutes a major proportion of the total domestic production of that product.

**9.** In its preliminary investigation, the Commission referred to package market shipments as "spot" market sales.

**10.** The relevant period of importation is 1976 through September of 1980.

legislative history is determinative in its discussion of demonstrable trends.[11] As discussed below, we find that in making its final determination, the Commission may not consider trends such as market penetration alone, but must consider such trends in conjunction with threat of the specific indicia of present material injury.

The Commission's statutory task is to determine whether an industry in the United States is materially injured or threatened with material injury by reason of imports being sold or likely to be sold at LTFV. Section 1673d(b)(1)(A)(ii) provides that the "Commission shall make a final determination of whether ... an industry in the United States ... is threatened with material injury ... by reason of imports of the merchandise with respect to which the administering authority has made an affirmative determination [of sales at LTFV]...."[12]

Threat of material injury is not defined in 19 U.S.C. § 1673d(b)(1)(A)(ii) or in any other section of the Act. The ITC's regulations provide no further definitional assist-

ance. Moreover, what little agency practice in this area exists, offers limited guidance.

In contrast to the dearth of guidelines for the determination of threat of injury, the statute contains detailed specifications for the determination of material injury. In general, " 'material injury' means harm which is non-inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A) (1982); 19 C.F.R. § 207.27 (1983). In making an injury determination, the Commission is required to consider, among other factors, the following:

(i) the volume of imports of the merchandise which is the subject of the investigation;

(ii) the effect of imports of that merchandise on prices in the United States for like products, and

(iii) the impact of imports of such merchandise on domestic producers of like products.

19 U.S.C. § 1677(7)(B)(i)–(iii) (1982); *see* 19 C.F.R. § 207.26(a)(1)–(3) (1983).

---

**11.** The legislative history places importance upon demonstrable adverse trends, in particular market penetration. The House Report states at p. 47:

> In examining threat of material injury, the ITC will determine the likelihood of a particular situation developing into actual material injury. In this regard, demonstrable trends— for example, the rate of increase of the subsidized or dumped exports to the U.S. market, capacity in the exporting country to generate exports, the likelihood that such exports will be directed to the U.S. market taking into account the availability of other export markets, and the nature of the subsidy in question (i.e. is the subsidy the sort that is likely to generate exports to the U.S.)—will be important. However in considering threat, high present capacity utilization of the domestic industry and the absence of other indicia of present injury should not be considered as conclusive as to the absence of threat of injury.

> An increase in market penetration may be an early warning signal of injury. Indicia of the threat of material injury will vary from industry to industry. The ITC should place emphasis on the rate of increase of market penetration, particularly if market penetration is achieved by prices which are below

U.S. price levels, but which are maintained in the home market.

H.Rep. No. 317, 96th Cong., 1st Sess. 47 (1979). The Senate Finance Committee has similarly stated:

> The ITC will continue to focus on the conditions of trade and competition and the nature of the particular industry in each case. For example, in some cases, *e.g.,* an industry producing a product which has a relatively short market life and significant research and development costs associated with it, a rapid increase in market penetration could quickly result in material injury to that industry. The existence of such increases in market penetration may be a particularly appropriate early warning signal of material injury in such cases.

S.Rep. No. 249, 96th Cong., 1st Sess. 89 (1979), U.S.Code Cong. & Admin.News 1979, pp. 381, 475.

**12.** In order to make a final affirmative determination in its injury investigation, the ITC must find that an industry in the United States: (1) is materially injured or (2) is threatened with material injury or (3) the establishment of an industry is materially retarded, by reason of imports being sold or likely to be sold at LTFV. *See* 19 U.S.C. § 1673d(b)(1) (1982).

Although economic factors indicating a threat of material injury vary from case to case, the factors required to be considered in a final determination of present injury must be reviewed in the threat of injury context to determine the imminence of actual injury. *Cf. Republic Steel Corporation v. United States,* —— C.I.T. ——, ——, 591 F.Supp. 640 (1984) ("The essence of a threat lies in the ability and incentive to act imminently"). Had Congress directly considered this matter,[13] it would have required the Commission when making its final determination to look to these concrete standards in assessing threat of material injury.[14] The general construction of the antidumping laws and the policy of fair treatment to domestic and foreign industries require this result.[15]

■ There is support for the view expressed here in the legislative history of the Act:

In determining whether an industry in the United States is threatened with material injury, the ITC will consider the

*likelihood of actual material injury occurring.*

S.Rep. No. 249, 96th Cong., 1st Sess. at 88 (1979), U.S.Code Cong. & Admin.News 1979, at p. 474 [hereinafter "Senate Report"] (emphasis provided).

In examining threat of material injury, the ITC will determine *the likelihood of a particular situation developing into actual material injury.*

H.Rep. No. 317, 96th Cong., 1st Sess. at 47 (1979). [hereinafter "House Report"] (emphasis provided).[16]

This does not conflict with the proposition that is in order to finally determine threat of material injury, the Commission will be required to examine factors relating to future conduct. *Cf. Republic Steel Corporation v. United States,* —— C.I.T. ——, ——, 591 F.Supp. 640 (1984). Furthermore, we see no inconsistency between the requirement that the factors indicating present injury be considered when examining threat and Congress' statement that the absence of any indicia of present injury should not be considered conclusive that

**13.** "The court's effort must be to discern dispositive legislative intent by 'projecting as well as it could how the legislature would have dealt with the concrete situation if it had but spoken.'"
*Asahi Chemical Industry Company, Ltd. v. United States,* 4 C.I.T. 120, 124, 548 F.Supp. 1261 (1982) (quoting *District of Columbia v. Orleans,* 406 F.2d 957, 958 (1968) (quoting *City of Chicago v. FPC,* 385 F.2d 629, 635 (D.C.Cir.1967) (footnote omitted))). *See also* Re, *International Trade Law and the Role of the Lawyer,* 13 Cal. W.Int'l.L.J. 363 (1983).

**14.** *Cf. Republic Steel Corporation v. United States,* —— C.I.T. ——, ——––——, ——––——, . 591 F.Supp. 640 (1984), wherein the court contrasts requirements for a preliminary finding of injury or threat of injury with those applicable to a final determination.

**15.** Where it is apparent that Congress did not think about a problem, it is incumbent upon the court to consider the policies underlying the statutory provision. *Rose v. Lundy,* 455 U.S. 509, 516–518, 102 S.Ct. 1198, 1202–1203, 71 L.Ed.2d 379 (1981) (citing *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975) (In expounding a statute, court must look to the provisions of the whole law, and to its object and policy)); *Unexcelled Chemical Corp. v. United States,* 345 U.S. 59, 64,

73 S.Ct. 580, 583, 97 L.Ed. 821 (1953) ("Arguments of policy are relevant when for example a statute has an hiatus that must be filled or there are ambiguities in the legislative language that must be resolved.")

**16.** We further note that the review of present injury factors in a threat of injury determination is consistent with the General Agreement on Tariffs and Trade (GATT), which states that "[a] determination of injury [ ] for purposes of Article VI of the General Agreement shall involve an objective examination of both (a) the volume of subsidized imports and their effect on prices in the domestic market for like products [ ] and (b) the consequent impact of these imports on domestic producers of such products." Agreement on Interpretation and Application of Articles VI, XVI and XXIII of the General Agreement on Tariffs and Trade, April 12, 1979, 31 U.S.T. 527, 513, T.I.A.S. 9619 —— U.N.T.S. —— (footnotes omitted). Moreover, "[d]eterminations of injury under the criteria set forth in this Article shall be based on positive evidence. In determining threat of injury the investigating authorities, *in examining the factors listed in this Article,* may take into account the evidence on the nature of the subsidy in question and the trade effects likely to arise therefrom." *Id.* at Art. 6, ¶ 1, n. 17 (emphasis provided).

threat of injury does not exist.[17] That is, in some cases the intensity of, or threat with regard to one or two factors may so persuade the Commission of threat of injury that the absence of one or another will be no bar to a finding of the requisite threat.[18] In addition, threat with regard to one factor denoting present injury is not necessarily present existence of that factor, as we will discuss *infra.*

■ We now consider plaintiffs' challenges to the Commission's findings with respect to import volume, the effects of imports upon domestic prices and impact of French ASM imports upon the domestic industry, which are factors to be considered in finding present injury. We find that the Commission is required to and did consider [19] whether there is threat of injury with regard to:

> ... the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant.

19 U.S.C. § 1677(7)(C)(i) (1982); *see* 19 C.F.R. § 207.26(b)(1) (1983). Plaintiffs allege that the Commission erred in its determinations concerning import volume. Their main argument is that since French ASM imports during the first nine months of 1980 were only 1.9% higher than for the corresponding period of 1979, which was a much less pronounced increase than the dramatic increases in volume in preceding years, that the significance of the upward trend was minimized. The Commission concluded that the ITA's preliminary determination of sales at LTFV,[20] the requirement that bonds be posted on all French

ASM imports entering the United States after September 5, 1980, and this pending case, accounted for a reduction in the increase of imports entering the United States.[21] Plaintiffs criticize this as speculative. To bolster their claim of speculation, plaintiffs assert that the only reason import levels for the first nine months of 1980 increased at all was due to a threatened strike. Plaintiffs contend that the Commission should not have disregarded evidence which plaintiffs introduced, consisting of import orders marked "strike inventory."

We note, as did the Commission, that imports did not decrease in 1980 in relation to the corresponding period in 1979. What is clear is that the volume of imports during the relevant periods increased steadily and dramatically until 1980, at which time only the rate of increase declined. There is logic in the Commission's view regarding the effect of the events relating to this case on the rate of increase of imports. This is a corollary to the more obvious principle that "... the antidumping order, operating as a strong corrective or deterrent can be presumed to distort the meaningfulness of observable data regarding present conduct in the United States market." *Matsushita Electric Industrial Co. v. United States,* 6 C.I.T. ——, 569 F.Supp. 853, 862 (1983), *motion for rehearing denied,* 6 C.I.T. ——, 573 F.Supp. 122 (1983).

In regard to the effect on import volume of the threatened dock strike, it is unclear whether any of the orders marked "strike inventory" predated the antidumping petition involved here. In view of the probable effects of that petition, the motivation for marking later import orders "strike inven-

---

**17.** *See* footnote 11 (citing House Report at 47).

**18.** The presence or absence of any factor which the Commission is required to evaluate under ... [the above provisions] shall not necessarily give decisive guidance with respect to the determination by the Commission of material injury.

19 U.S.C. § 1677(7)(E)(ii); *see* 19 C.F.R. § 107.27 (1983); *see American Spring Wire Corporation v. United States,* —— C.I.T. ——, ——, 590 F.Supp. 1273 (1984).

The legislative history is in accord:

> The significance of the various factors affecting an industry will depend upon the facts of each particular case. Neither the presence nor the absence of any factor listed in the bill can necessarily give decisive guidance with respect to an injury determination.

House Report at 46.

**19.** *See* Final Determination at 6.

**20.** Commerce calculated a tentative 50 percent margin in its preliminary determination.

**21.** *See* Final Determination at 6.

tory" is in doubt, and the Commission could properly minimize the evidentiary weight to be given to such orders. This factor, together with the other data on import volume, leads to the conclusion that the Commission's finding was reasonable.

In addition, in assessing threat of increased imports, the Commission properly considered Rhone Poulenc's selling practices and production capabilities.[22] The record supports the conclusion that Rhone Poulenc was not producing at capacity. Since maximum capacity utilization is a key to maximum profitability in this industry, there is certainly incentive for Rhone Poulenc to increase its production. In addition, there is no evidence that any long term contracts existed, which would commit sales; in fact, the Commission concluded that there was a likelihood of further expansion into the United States market because of favorable shipping arrangements, a regional warehouse system, an established sales network, unused production capacity and possible diversion of stock from 70 other purchasing countries to the United States. Obvious United States import penetration has occurred and is likely to continue, especially if stock is diverted to this country.

Plaintiffs' argument that this conclusion is speculative is unpersuasive. It is true that threat of material injury may not be based on supposition or conjecture. Senate Report at 88–89; House Report at 47. The threat must be real and imminent. *Id.* But this case contrasts sharply with *Alberta Gas Chemicals, Inc. v. United States,* 1 C.I.T. 312, 515 F.Supp. 780 (1981) wherein the threat of injury, particularly as it related to increased imports, was based on remote possibilities or contingencies.[23] The factors discussed above indicate that the threat is real here. Therefore, we find that the Commission properly found threat of increases in import volume.

■ Plaintiffs also claim that the Commission failed to consider the effects of imported ASM upon prices for the like domestic product. We find that the Commission must and did consider the threatened "effect of imports of that merchandise on prices in the United States for like products ..." 19 U.S.C. § 1677(7)(C)(ii) (1982). In evaluating the effects of imports upon prices, the Commission shall consider threat of:

(I) ... significant price undercutting by the imported merchandise as compared with the price of like products of the United States, and

(II) the effect on imports if such merchandise otherwise depresses prices to a significant degree or prevents price in-

---

**22.** Plaintiffs claim to have placed an annual upper limit on shipments of ASM to the United States. Plaintiffs also claim to have demonstrated that exports to the United States would not increase through 1985. The majority and Commissioner Stern in her concurrence permissibly discounted this evidence based upon the fact that if Rhone Poulenc exported the full amount of the "self-imposed quota," ASM imports would increase by 20 percent over 1979 levels. Final Determination at 6; *Id.* at 20 (Stern concurrence).

**23.** In *Alberta Gas,* the Commission's finding of likelihood of injury was based upon the possibility that the foreign exporter of natural gas, at some future time, would construct new production facilities in Canada and that the United States market would be a logical target for penetration with increased Canadian production. The court concluded that additional exports to the United States were unlikely in the immediate future because:

(1) the exporter was producing at virtually one hundred percent capacity, and

(2) nearly all production was committed under contractual agreements to existing customers, and

(3) the exporter's markets outside of the United States were expanding, and selling prices in those markets were higher than corresponding United States prices, and

(4) no significant increase in United States import penetration could have occurred even had the entire inventory been suddenly diverted to the United States, and

(5) Even if the exporter had immediately set out to expand its facilities, production in the new facilities could not commence for a year at the earliest, assuming there were no unforeseen delays. The Commission had assumed that there would be no future rise in demand for the product in the U.S. market, where in fact it was clear there would be an increase.

creases, which otherwise would have occurred, to a significant degree.

19 U.S.C. § 1677(7)(C)(ii)(I)–(II) (1982); 19 C.F.R. § 207.26(b)(2)(i)–(ii) (1983).

Plaintiffs complain that, although Commissioner Stern characterized underselling as significant, the majority opinion lacks such a finding. Although the concise expression of such a finding is preferable, we are reluctant to require the ITC to state its position with technical exactitude in this developing area of the law. The majority found that over the period studied, the price differential between imported and domestic products varied from $4.85 to $1.40 per 100–pound bag, with the French ASM underselling domestic ASM by 6 to 35 percent; and that in all eleven investigated instances of lost sales, totalling $703,320, price was given by purchasers as the principal reason for switching from the domestic to the foreign product. In fact, the record shows that several purchasers stated that it was necessary to purchase imported ASM in order to remain competitive. As noted previously, the record establishes that ASM is commercially interchangeable, and therefore is highly price sensitive. Sales were obviously lost because of price undercutting and in a market which is already burdened with lessening demand, "lost sales" can be a critical element in determining threat of injury. Absent some showing to the contrary, the Commission is presumed to have considered all evidence in the record. *Sprague Electric Company v. United States*, 2 C.I.T. 302, 310, 529 F.Supp. 676, 682 (1981); *see also United States v. Chemical Foundation*, 272 U.S. 1, 14–15, 47 S.Ct. 1, 6, 71 L.Ed. 131 (1926); *National Nutritional Association v. FDA*, 491 F.2d 1141 (2d Cir.1974), *cert. denied*, 420 U.S. 946, 95 S.Ct. 1326, 43 L.Ed.2d 424 (1975); *Braniff Airways v. CAB*, 379 F.2d 453 (D.C.Cir.1976). Therefore, we find that the Commission's findings, in conjunction with the record which it is presumed to

have considered, establish a threat of significant negative effects on prices.[24] *See* 19 U.S.C. § 1677(7)(E)(ii) (1982); *see also* 19 C.F.R. § 107.27 (1983); Senate Report at 88; House Report at 46.

Plaintiffs also contend that the Commission failed to consider the impact of French ASM imports upon the domestic industry. We find that in making its threat of material injury determination,

> ... the Commission shall consider, among other factors ... (iii) The impact of imports of [the relevant] merchandise on domestic producers of like products.

19 U.S.C. § 1677(7)(B) (1982).

Furthermore, as far as it is possible in evaluating the impact of imports upon the threatened industry:

> ... the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry, including, but not limited to—
>
> > (I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,
> >
> > (II) factors affecting domestic prices, and
> >
> > (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment.

19 U.S.C. § 1677(7)(C)(iii) (1982); 19 C.F.R. § 207.26(b)(3)(i)–(iii) (1983).

Plaintiffs claim that the majority's statement of confirmed "lost sales" is not an assessment of the effect of imports upon the United States ASM producers or production. The crux of plaintiffs' argument is that the majority did not show that the "lost sales" or any factor had caused an actual or potential decline in any injury factor mentioned in the statute. We reject this argument based upon our preceding discussion of "lost sales." Additionally,

---

**24.** Plaintiffs contend that nothing in the administrative record indicates that the Commissioners complied with the statutory directive to consider whether French ASM imports depressed domestic prices or prevented price increases.

Plaintiffs confuse threat of injury with present injury. It is irrelevant that no price suppression occurred. It is clear the price suppression is threatened because of the threat of continued lost sales based on price.

see the discussion *infra* of the "bulk" and "package" markets.

■ Also, plaintiffs allege that lost sales and underselling can only have meaning where they are compared to the production and sales of domestic ASM during the periods in which the lost sales occurred. This argument has no merit in a threat of injury context. There is no evidence in the legislative history or any policy concern apparent to this court which would suggest that lost sales and undercutting must be linked to *present* damage to overall sales, profits or production. In an industry such as this where continuous production is closely linked to profit, the Commission could find (this is the thrust rather than the exact wording of the determination) that lost sales indicated a threat to future sales, production and profitability.[25] Such a finding is also bolstered by the factors discussed in connection with import volume. Any argument that such less stringent requirements for a threat of injury case will make meaningless actual injury requirements, is defeated by the additional requirement in threat cases of the existence of demonstrable trends and capacities in specific areas. *See* footnote 11. For these reasons, we conclude that the Commission properly considered actual material injury standards in determining that there was threat of material injury.

■ Plaintiffs' next contention is that the Commission erred by basing its determination of threat of injury upon aggregated data for the domestic industry, rather than on the condition of each domestic producer. Plaintiffs argue that reliance upon

aggregated data for all producers is not legally sufficient because the threat of injury must extend to all producers, or to those who account for a major proportion of domestic production. Plaintiffs complain that "[t]he Commission's determination did not discuss whether any individual ASM producer had suffered injury or threat thereof by reason of French imports." In particular, plaintiffs rely upon 19 U.S.C. § 1677(4)(A), the general definition of "industry", and *Atlantic Sugar, Ltd. v. United States (Amstar Corporation, Party in Interest)*, 2 C.I.T. 295, 553 F.Supp. 1055 (1981).

Defendants argue that a plain reading of the statute shows that Congress authorized evaluation of aggregated data for the domestic industry. Defendants contend that the statutory definition refers to the industry "as a whole," or its "collective output," and therefore supports aggregation of industry-related data. *See* footnote 8; *compare* 19 U.S.C. 1677(4)(A) (1982). We disagree that this issue can be determined by a simple reading of the statute. Whatever the words "as a whole" or "collective output" were meant to connote, they do not clearly and unambiguously condone aggregation of data for a national industry. Once again, the policies underlying the statute, in this case, the policy of utilization of the most reliable evidence, dictates the result.[26]

We find the *Atlantic Sugar* case instructive in this area. In the *Atlantic Sugar* case, the Commission issued an affirmative injury determination with respect to an eleven-state northeastern region in which

---

**25.** This is not a *de novo* action and we may not substitute our judgment for that of the Commission; it is enough that the evidence was fairly susceptible of the Commission's interpretation. *See American Spring Wire Corporation v. United States*, —— C.I.T. at ——, 590 F.Supp. 1273.

**26.** Defendants set forth two additional arguments which we dismiss with only brief comment. First, defendants argue that Commission practice under the Antidumping Act of 1921 and Congress' intent that the existing practice continue under the Trade Agreements Act of 1979, defeat plaintiffs' position. Defendants have presented no authority or evidence that Com-

mission practice was to evaluate aggregate data under predecessor law, and *assuming arguendo* that this was, in fact, the practice, defendants cite and we find no approval or specific endorsement of the particular practice in the legislative history pertaining to current law. Defendants' second argument that plaintiffs' (and this court's) interpretation of the aggregation principle would nullify or void presently available relief is circular in nature, and presupposes the correctness of defendants' interpretation that a different variety of relief exists in the first place.

seven producers were located. In determining that the industry in the region had suffered material injury, the Commission had averaged the corrected data which indicated a net profit for the period in question for the second largest producer in the region with the data for the other producers. The ITC found that aggregate profits in the region had declined. It rejected the argument that it was incorrect to aggregate data for the purpose of determining whether the "producers of all or almost all of the production" are materially injured. It reasoned that "the statute is concerned with determining whether a regional industry is being materially injured, not whether particular producers are injured." *Atlantic Sugar, Ltd. v. United States*, 2 C.I.T. 295, 300 (1981).

The court rejected the Commission's position, holding that the Commission must consider injury to individual firms in determining whether there is injury to a regional industry:

> There is no justification for general or "aggregate" determinations which do not reflect the specific condition of individual producers included in the "aggregate" .... Injury to an *industry* cannot be determined without first finding injury to individual producers .... It seems to the court that individual firm data are the foundation of this determination and it is only when the facts show injury to individual producers that they may be utilized for broader conclusions about the industry .... [T]he only aggregation permitted by the law is that of the production of those who have been injured individually. If their production represents all or almost all of the region's

production then the *industry* has been injured within the meaning of the law.

*Id.* (footnote omitted).

The court further stated in that case:

> If there are producers who are not injured that fact must be confronted directly. *It is incorrect to nullify the profitable operation of one producer by blending it with the loss of another and presenting the result as an "aggregate" indication of injury to both.*

*Id.* at 301.

While the *Atlantic Sugar* court distinguished the case of injury to a national industry where only producers of a *major* proportion of production, as opposed to a regional industry, where *all or almost all* of the producers, must be injured, it did not negate the principle that aggregation is ordinarily inappropriate in either case.[27] Thus, we reject defendants' arguments that the *Atlantic Sugar* decision is flatly distinguishable from this case because it involved injury to a "regional" rather than to a "national" industry and that in any case, *Atlantic Sugar* is incorrect. But, we find that the Commission did not base its decision upon improperly aggregated data.

Plaintiffs argue that the evidence shows that only one of four domestic ASM producers could possibly be considered "threatened" with injury by French imports, and that this sole producer does not account for a "major proportion" of domestic ASM production. Presumably, plaintiffs base this argument on the fact that only one domestic producer, PQ, suffered serious economic losses, and thus "injury."[28] Whereas plaintiffs are correct on

---

**27.** We note that even this rule disfavoring aggregation of economic data has exceptions. Indeed, in a subsequent decision after remand in *Atlantic Sugar*, the court elaborated upon its earlier criticism of the use of aggregate data in an injury investigation, and recognized an exception. The court observed that, while the rule should be strictly enforced in circumstances where there are a limited number of producers, "the requirement of individual injury determinations may present insurmountable administrative problems where there are numerous producers." *Atlantic Sugar, Ltd. v. United States*, 4

C.I.T. 248, 252, 553 F.Supp. 1055, 1060 (1982). The court concluded that in appropriate cases, the finding of injury may be based upon methods other than direct investigation. This case does not involve numerous producers.

**28.** Plaintiffs pointed out at oral argument the current profitability of the industry. However, no single factor, including profitability, is conclusive or decisive in a material injury determination. *Atlantic Sugar, Ltd. v. United States*, 553 F.Supp. 1055, 1059 (1982); *accord American*

the law pertaining to aggregation, their position fails in its application in a "threat" of injury context.

It is clear that the threat of material injury must be posed to a major portion of this national industry. Although PQ produced more than any other individual domestic producer, PQ did not produce a "major proportion" of ASM in relation to total domestic ASM production. Therefore, it is apparent that to sustain the ITC's finding in this case, this court must find that producer(s) in addition to PQ were threatened with injury and that their collective output represents a "major proportion" of total United States ASM production.

"Threat" of injury is necessarily a more diffuse standard than present injury. It is even less amenable to quantification than the present injury standard.[29] Moreover, nowhere in the legislative history, nor in any other source to which this court has turned, has there appeared the suggestion that the "threat" posed to one domestic producer need be the identical threat posed to another. Nonetheless, producers of a major portion of production must be threatened with injury deriving from the same source of imports. Different producers might be faced with different types of "threat" or threat of greater or lesser injury, but this does not necessarily diminish the fact that threat exists. The court finds that based on the evidence discussed thus far in this opinion, the Commission could properly find threat to producers of "a major proportion" of production even though only a producer of a smaller portion of production suffered what seems to be *present* injury.[30]

■ Plaintiffs next contend that the Commission erroneously used a regional industry analysis in making its affirmative determination. At the outset, it must be recognized that the Commission analyzed a national industry, not a regional industry. A regional analysis is appropriate only in special statutorily prescribed circumstances.[31] The Commission majority expressly determined that a four state "Northeast market" does not meet the statutory criteria for a regional industry.[32] Any claim by plaintiffs that the ITC actually conducted a regional industry analysis was abandoned at oral argument.

Plaintiffs' "regional industry" challenge raises the issue of whether in the present case the ITC impermissibly based its determination solely upon developments in the Northeast market in order to reach a determination of threat of injury to a national

---

*Spring Wire Corporation v. United States,* —— C.I.T. at —— –——, 590 F.Supp. 1273.

**29.** *See generally* Krauland, *The Standard of Injury in the Resolution of Antidumping Disputes,* Mich.Y.B.Int'l. Legal Studies 164 (1979) (Academicians and practitioners alike have expressed a desire for a coherent body of law upon which they can rely with certainty with respect to a reliable standard of injury for antidumping disputes; however, articulation of "hard and fast" rules could hinder agency flexibility in enforcement of international trade laws.)

**30.** It is clear from the record, particularly the evidence discussed in Commissioner Stern's opinion, that the Commission was not misled by any aggregation of data. Although the Commission could have stated its finding in this regard more clearly, what is clear from the record is that the thrust of the Commission's determinations amounted to the proper finding. *See American Spring Wire Corporation v. United States,* —— C.I.T. at ——, 590 F.Supp. 1273.

**31.** In certain cases, the ITC can consider whether a regional industry is harmed by LTFV imports, provided that:

(i) the producers within such [regional] market sell all or almost all of their production of the like product in question in that market, and

(ii) the demand in that market is not supplied, to any substantial degree, by producers of the product in question located elsewhere in the United States.

19 U.S.C. § 1677(4)(C)(i)–(ii) (1982).

**32.** The Commission majority stated:

In this instance, the Northeast market is supplied by three plants, only one of which is located in the Northeast market. Both plants outside the area, one in Texas and the other in Illinois, ship significant quantities of ASM into the Northeast market, therefore disallowing the finding of a regional industry.

Final Determination at 8, n. 2.

industry.[33] Plaintiffs argue that the Commission did not examine the Northeast market incidental to examining the ASM industry on a national scale, but rather, based its determination solely upon developments in the Northeast market.

It is clear after passage of the Act and, consequently, the statutory definition of "regional industry," that in cases where the Commission has determined the relevant industry to be a regional one, data from outside of the confines of the region may not be used to arrive at an industry determination. *Atlantic Sugar, Ltd. v. United States*, 2 C.I.T. 295 (1981). The converse of this issue, and the question raised in this case is whether developments in a regional market may support a finding of threat of material injury for a national industry.

The issue of whether injury or threat of injury in a geographical region constitutes injury to an industry has a long and troubled history. *See* Wasserman, *Injury From Dumping: The Problem of the "Regional Industry,"* 9 Ga.J. of Int'l. and Comp.L. 469 (1979). Until 1979, the confusion caused by views expressed by the Senate Finance Committee in 1975 [34] coupled with at least two and one-half decades of so many different views expressed by various Commissioners,[35] facilitated the support of almost any position which might have seemed appropriate in any particular situation. *See id.* at 486. In an effort to ameliorate the many problems which had arisen in this area, Congress enacted for the first time a statutory provision prescribing the scope and terms of the regional industry in the Trade Agreements Act of 1979.[36] Not all ambiguities, however, were definitively resolved by the Act's passage, including the question of how to treat a case concerning producers from various regions and an investigation which concentrates on a more limited geographical market.

Government-defendant cites at length from the Customs Court decision in *Pasco Terminals, Inc. v. United States*, 83 Cust.Ct. 65, 477 F.Supp. 201 (1979), *aff'd*, 68 CCPA 8, 634 F.2d 610 (1980), for the proposition that "the Commission may properly consider the conditions in relevant sub-markets as a basis for material injury." Government-defendant's Memorandum at 26. In so citing, defendant suggests that a

---

**33.** Plaintiffs seem to have narrowed their original challenge, as they state in their final submission: "[p]laintiffs do not suggest that the Commission may not, as a matter of investigative technique, consider developments in particular regional markets."

**34.** In considering the necessary causal relationship between LTFV imports and injury to an "industry," the Senate Finance Committee raised the question of whether injury to a "regional industry" constituted injury to a "national industry:"

A ... question relating to injury and industry arises when domestic producers of an article are located regionally and serve regional markets predominantly or exclusively and the less than fair imports are concentrated in a regional market with resulting injury to the regional domestic producers.

S.Rep. No. 93–1298, 93rd Cong., 2d Sess. 180–81 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7186, 7317.

In attempting to answer its own question, the Senate Committee held:

... that injury to a part of the domestic industry [amounted to] injury to the whole domestic industry.

*Id.* at 181, U.S.Code Cong. & Admin.News 1974, at p. 7317.

**35.** *See, e.g., Sugar from Belgium, France and West Germany*, Determination of injury No. AA1921–198, 199, 200, U.S. ITC Publication 972, May 1979 (*compare* majority and concurring opinions); *Carbon Steel Plate from Taiwan*, Determination of injury or likelihood thereof, No. AA1921–197, U.S. ITC Publication 970, May 1979; *Portland Hydraulic Cement from Canada*, Determination of no injury No. AA1921–184, U.S. ITC Publication 918, September 1978 (each of three participating Commissioners concluding that American producers located in the Northeastern region of the United States constituted a regional industry; but one Commissioner determining that American producers not being injured by reason of imports; one Commissioner determining American producers were injured; and one Commissioner determining that it would be more "appropriate" to disregard the regional industry and consider the national industry).

**36.** 19 U.S.C. § 1677(4)(C). Congress had previously amended the Antidumping Act on three separate occasions without resolving the problem of the regional industry.

regional sub-market in and of itself may serve as the basis for finding threat of injury to a national industry. In the *Pasco Terminals* case, sulphur from Mexico being sold and offered at LTFV was found to be causing injury to a domestic industry. Although the Commission designated an industry which was national in scope,[37] its examination focused upon Tampa and the United States east coast where it found that LTFV sales and offers had contributed to general depression of prices and to market disruption.

Government-defendant relies upon this particular passage from *Pasco* approving the Commission's determination:

Plaintiff's next argument is that there was no evidence adduced at the hearing that Azufrera had engaged in any disruptive activity in connection with sales to east coast customers albeit dumping duties were assessed on east coast shipments. But this argument overlooks the principle that under the Antidumping Act, a *national industry may be injured if injury is experienced in only a portion of its market.* See *Imbert Imports, Inc. v. United States, supra,* 60 CCPA at 127; *Ellis K. Orlowitz Co. v. United States,* 50 CCPA 36, 40–42, C.A.D. 816 (1963). Once an injury is found anywhere, the Constitution itself requires that any resulting dumping duties be uniformly assessed throughout the United States, wherever the merchandise is entered. Therefore, *even if the Commission had found that injurious events occurred only in Tampa, dumping duties still would have been properly assessed on merchandise entered on the east coast.*

There is the further consideration that there was considerable evidence about the "ripple" or "spillover" effect of price reductions in the Tampa area into the east coast area.....

83 Cust.Ct. at 89, 477 F.Supp. 201 (Government-defendant's emphasis).

Because the highlighted portions of the cited passage are modified somewhat by the surrounding language and because the *Pasco* case also considers "spillover" effects, standing alone it will not sustain defendants' position. *See also Ellis K. Orlowitz Co. v. United States,* 200 F.Supp. 302, *aff'd,* 50 CCPA 36 (1963).

 Nonetheless, it appears to the court that in a case where producers from various regions operate in a given regional market, threat of injury in that market may be threat to a national industry. In some circumstances this can be the early warning sign of which Congress spoke.[38] The significant question is how imminent and real is the threat to the national industry. As in *Pasco,* if there is demonstrable evidence of spillover to other markets, it is likely that the threat will be considered substantial. On the other hand, in a case where the sub-market under study is an insignificant segment of the whole market, injury in that market alone, even to numerous producers, may not result in a finding of threat to the national industry. We conclude, therefore, that a case by case analysis is necessary. *See Bethlehem Steel Corp. v. United States,* Slip Op. at 28, —— C.I.T. at ——, 590 F.Supp. 1237.

In the present case, there is a variety of evidence upon which the Commission relied which indicates that it considered national or "spillover" effects, even though its investigation concentrated on the northeast region. By far, the most dramatic evidence that the Commission considered was Rhone Poulenc's expansion from that region into other areas of the country. While prior to 1979 the vast majority of Rhone Poulenc's sales were in the northeast, in 1979, this level dropped to 78% as the result of Rhone Poulenc's market expansion into such cities as Miami, Los Angeles, and San Francisco. The Commission found that "[t]his trend

---

37. The Commission designated the domestic industry as: "domestic facilities of U.S. producers devoted to mining and recovery of sulphur." 83 Cust.Ct. at 88, 477 F.Supp. 201.

38. Senate Report at 89; House Report at 47–48. *See also Matsushita Electric Industrial Co. v. United States,* 6 C.I.T. at 21, 569 F.Supp. 853.

indicates that Rhone Poulenc is expanding its areas of import penetration with a deliberate marketing plan." Final Determination at 7.[39] In addition, the Commission relied upon other broad trends with national effects. Lost sales data were verified from several purchasers on the west coast who became newly-won customers of Rhone Poulenc. Moreover, Rhone Poulenc had established a series of regional warehouses and a United States sales network, which facilitated this expansion.[40] The evidence also indicates that the entire industry was vulnerable to LTFV imports of ASM, based upon dramatic decreases in United States consumer demand for and consumption of ASM, overcapacity of the industry, nationwide price sensitivity and general fungibility of the product, and the fact, which was noted by the Commission, that all questioned purchasers who "switched" to French ASM did so because of price. Also, Rhone Poulenc's share of the ASM market for the entire United States had increased. Therefore, we find there was no reliance by the Commission upon an analysis of an inadequate sub-market.

Plaintiffs next claim that the Commission improperly divided the relevant United States market for various types of ASM.[41] Plaintiffs claim that the Commission erred by basing its determination relating to the impact of imports on the United States "package" market and that the Commis-

sion should have based its analysis upon the entire United States market for ASM. Plaintiffs contend that the impact of imports should be considered relative to *total* production or consumption in the United States. They further assert that whether packaged or unpackaged,[42] domestic ASM is a "like product," and that no separate threat of injury may be ascribed to a package market.[43]

Defendants apparently argue, as they did with respect to the regional industry issue, that it is within the Commission's discretion and statutory authorization to rely upon data and developments relating to a competitive product sub-market, namely the "package" ASM market, in its consideration of trends indicating threat of injury. We need not decide this issue because we find that the Commission relied upon an analysis of the entire United States ASM industry.

In its determination, the Commission majority found national market penetration for the entire ASM market, as imports increased from 0.8 percent in 1977 to 4.4 percent in 1979. This represents an upward trend of over five-fold. However, the majority opinion did rely upon the so-called package market in particular.[44] The package market is a large portion of the total market.

39. In regard to market penetration, a sales manager for Rhone Poulenc testified at the hearing below that "what we are attempting to do ... is to sort of spread out ourselves a little bit so we don't concentrate in any one area which is usually the reason why you get a petition, where we have grabbed in any geographical area too high a portion." Commission's Preliminary Injury Determination of June, 1980. USITC Publication 1080 at 26.

40. The Commission also considered special shipping arrangements available to *Rhone Poulenc* which lowered transportation costs, thereby facilitating broader market penetration. *See* Final Determination at 7.

41. 19 U.S.C. § 1677(7)(C)(iii) provides that: In examining the impact on the affected industry, the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry.

42. "Unpackaged" or "non-package" ASM refers to bulk and captive sales of the product.

43. The Commission did decide that all ASM constituted the "like product." *See* footnote 7 for the definition of "like product."

44. The package market takes on a special significance in this case because that is the only market in which the imported and domestic products compete. As stated at the public hearing, Rhone Poulenc currently cannot compete in the bulk market because of shipping problems .... While the Northeast market does not meet the statutory criteria for a regional industry [ ], it has been shown that the importer has captured an increasingly larger share of the area's package market, rising from 5.5 percent in 1977 to 25.3 percent in 1979.
Final Determination at 7–8 (footnote omitted).

Naturally, the increase in imports for the entire ASM market was not as dramatic as for the "package" ASM market, since French imports were shipped exclusively in packages. Nonetheless, strong demonstrable trends concerning production capacity, and marketing conditions and plans, which we have discussed previously support a finding of threat of material injury to the entire ASM industry.

■ For all the above-discussed reasons, we find that the decision of the Commission was based upon substantial evidence and is in accordance with law and that domestic producers of a major proportion of ASM are threatened with real and imminent injury due to the plaintiffs' imports.

### Adjustments to Foreign Market Value

Plaintiffs challenge the ITA's determination that plaintiffs' sales of ASM in the United States were at less than fair value. The ITA's determination was based on the difference between the price Rhone Poulenc charged in the United States (United States price) and the price Rhone Poulenc charged in its home market, France (foreign market value). This price differential served as the basis for determining that Rhone Poulenc had made sales at less than fair value.

Plaintiffs' challenge to the ITA's calculation of the price difference centers on plaintiffs' contention that the ITA erred in failing to adjust the home market price to compensate for technical expenses incurred in the home market. Plaintiffs initially contend that the technical expenses were directly related to the sales under consideration. If so, then an adjustment must be made pursuant to 19 U.S.C. § 1677b(a)(4) (1982), requiring adjustments for different circumstances of sale. Alternatively, plaintiffs contend that the expenses were generally related to sales, and that plaintiffs are entitled to a full adjustment for these expenses pursuant to 19 C.F.R. § 353.15(c) (1983), without regard to the limitation contained in the regulation.

Defendant and intervenor contend that plaintiffs have not shown that the claimed expenses were directly related to the sales under consideration, and that, to the extent any expenses were adjustable as general selling expenses, the adjustment was properly limited by 19 C.F.R. § 353.15(c).

■ The expenses at issue were related to technical services Rhone Poulenc offered to its customers in France. Rhone Poulenc prepared technical studies describing the proper use of ASM. Rhone Poulenc maintained laboratory facilities to answer questions and deal with problems posed by its French customers. A chemist employed by Rhone Poulenc visited the customers to provide advice on site. Plaintiffs contend they are entitled to an adjustment covering publication costs for the technical studies; and the personnel and operating expenses of the travelling chemist, his secretary and the laboratory that are attributable to service for ASM customers during the period of the investigation.

The ITA will only adjust the foreign market value for differences in the circumstances of sale such as technical services expenses "if it is established to the satisfaction of the ... [ITA] that the amount of any difference between the United States price and the foreign market value ... is wholly or partly due to ..." the technical services expenses. 19 U.S.C. § 1677b(a)(4), 19 C.F.R. § 353.15(a)(b). Thus, plaintiffs have the burden of demonstrating to the ITA that they are entitled to a circumstances of sale adjustment for expenses directly related to sales. *Id.* The ITA determined that plaintiffs had not met this burden and denied the adjustment.

The ITA rejected plaintiffs' adjustment claim on the ground that plaintiffs failed "to document and to demonstrate that the technical services have a reasonably direct bearing on, relationship to, or effect upon the sales under consideration." Anhydrous Sodium Metasilicate From France; Antidumping—Final Determination of Sales at Less Than Fair Value, 45 Fed.Reg. 77498, 77499 (1980). The legislative history of the Trade Agreements Act of 1979 makes clear that Congress intended the ITA to require a direct relationship.

[I]f adjustments are improperly made, the result may be an unjustifiable reduction in or elimination of the dumping margin. Therefore, the Committee intends that adjustments should be permitted if they are reasonably identifiable, quantifiable, and *directly related to the sales under consideration* and if there is clear and reasonable evidence of their existence and amount. (Emphasis added.)

H.Rep. No. 96–317, 96th Cong., 1st Sess. 76 (1979).

The record developed before the ITA details the basis for this determination. In a letter to plaintiffs' counsel, the ITA explained its policy concerning technical services adjustments:

"... With respect to technical services performed in the home market, adjustment for expenses which are incurred regardless of whether a particular sale is made, such as technicians' salaries, would be inappropriate. Adjustments for expenses incurred only when sales are actually made, such as travel expenses in connection with after-sale technical services, are only allowable where such expenses are incurred by a foreign company in its home market for the purchaser in connection with the particular sale under consideration, rather than as a service provided for all potential purchasers ...."

The verification report ... does not contain any indication that the research performed was related to the specific sales under consideration in this case. Rhone-Poulenc submitted to the Commerce Department representative neither contracts nor purchase orders which contained terms of purchase specifying that one of the terms of any individual sale was that Rhone-Poulenc would provide its purchaser certain technical assistance as a service to the purchaser. (citation omitted).

ITA Record [ITA R.] 80–81.

From this statement, the two primary bases for the ITA's determination are clear. The ITA will not adjust for any expense that would be incurred regardless of whether the particular sales under investigation are made. Thus, the ITA denied an adjustment for the salaries of permanent employees. And the ITA must be convinced that expenses related to sales are related to the particular sales under investigation, rather than sales generally, before the ITA will permit adjustment.

Congress has demonstrated its intent to rely on agency expertise in this highly technical area. *Smith-Corona Group v. United States,* 713 F.2d 1568 (Fed.Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). Still the court must carefully review the ITA's decision to ensure that it conforms to the underlying statutory requirement that antidumping margins be determined with a fair basis for comparison. *Silver Reed America, Inc. v. United States,* 7 C.I.T. ——, 581 F.Supp. 1290 (1984), *appeal docketed* No. 84–1118 (Fed.Cir. April 26, 1984).

As to the claimed adjustment for the cost of the technical studies and operating expenses, the ITA determined that plaintiffs had not shown the required direct relationship between the expenses and the sales under consideration. ·

Plaintiffs contend that the ITA improperly demanded that plaintiffs demonstrate that each claimed expense was performed as part of a contractual obligation for a particular sale under investigation. Plaintiffs are correct in noting that they need not attribute each expense claimed to a particular sale in order to qualify for a circumstances of sale adjustment. *See Smith-Corona Group v. United States,* 713 F.2d at 1580. But the ITA did not impose this burden on plaintiff.

The ITA sought evidence that the claimed services were performed to carry out the sales transactions at issue, rather than for purposes not directly related to the sales under consideration such as basic research or promoting good will and future sales. This distinction is critical given the

statutory criteria for qualifying for a circumstances of sale adjustment. The "difference between the United States price and the foreign market value ... [must be] wholly or partly *due to*" the claimed adjustment. 19 U.S.C. § 1677b(a)(4) (emphasis added).

This strict limit on adjustments for technical services is consistent with the basic purposes of the antidumping law. The antidumping law attempts to compare United States price and the foreign market value on as close to an equal basis as possible to determine whether the foreign manufacturer is charging a fair price in the export market. To calculate this, the ITA compares the price charged in the export market with the price charged at home and adjusts both prices to compensate for different marketing conditions in the respective markets. The statute and regulations permit adjustment for some expenses generally incurred in each market.[45] But otherwise, adjustments to the United States price are limited to specific costs or benefits involved in the transaction that directly change the sale price. Therefore, adjustments to foreign market must be similarly limited to provide a fair basis for comparison.

If Rhone Poulenc's sales obligations in France specifically included providing goods and technical services, and if Rhone Poulenc's sales obligations in the United States only included providing goods, then there would be different circumstances of sale and the costs of the services would be directly related to the sales under consideration. But to the extent the technical services were provided for independent purposes such as basic research or promoting good will and future sales, it would be inappropriate to permit a circumstances of sale adjustment. Costs of basic research benefit both the domestic and export market. It would be unfair to adjust for such expenses in one market and not the other. Costs incurred during the period of investigation to promote good will relate to future

sales and *ipso facto* do not directly relate to the sales under consideration.

From a careful review of the record it is clear that substantial evidence supports the ITA's conclusion that the technical services were not directly a part of Rhone Poulenc's sales obligations. Included in the verification report is a memorandum from plaintiffs' counsel to the Commercial Representative of the United States Embassy in Rome which details the precise nature of the technical services. This memorandum states that one of the principal duties of the technical services group is "to study new and different uses of ASM for the benefit of Rhone Poulenc's customers. New models of washing machines ... are studied carefully in order to determine how various detergent formulations will work best in them." ITA R. 321. These employees' work was not merely directed towards assisting with the use of products sold during the period under consideration. But rather, a large part of the technical services group's work was directed towards research and maximizing future sales through developing new uses for plaintiffs' products.

This memorandum also indicates that expenses for publication of technical studies were not directly related to the sales under consideration. These studies were prepared to respond to customer problems. But these studies are often rewritten "in more general terms and place[d] ... at the disposal of interested customers in order to make or promote specific sales." *Id.* at 322. Thus, the costs of studies published during the investigation period would, at least in part, be attributable to generating future sales, not the sales under consideration.

The ITA's decision that the salaries and related personnel expenses are not directly related to sales is clearly correct under the circumstances of this case. From the evidence in the record, it is apparent that the employees involved were Rhone Poulenc's permanent staff members. Salary and personnel expenses would have been incurred

---

**45.** The proper scope of these adjustments is discussed *infra*.

for these employees regardless of whether Rhone Poulenc made any sales at all during the period of the investigation. There is no direct relationship between these expenses and the sales under consideration. *Cf. Brother Industries, Ltd. v. United States*, 3 C.I.T. 125, 150, 540 F.Supp. 1341, 1364 (1982), *aff'd*, 713 F.2d 1568 (Fed.Cir. 1983).

This is not to say that personnel expenses could never qualify as a technical adjustment. For example, a manufacturer that hires workers on a job basis to perform technical services may be able to qualify for a technical services adjustment if it can demonstrate which personnel expenses are incurred for the particular sales under investigation. In such a case, personnel expenses would not be fixed, but would be directly related to sales.

Plaintiffs argue generally that they must be entitled to a circumstances of sale adjustment because their expense figures were verified as accurate. This argument misconceives the purpose of verification. The verification report substantiated that plaintiffs had incurred the claimed expenses. The report does not purport to determine the legal significance of these expenses. A telegram from the verification office notes "the question remains, however, as to whether the expenses can be related to specific ... [home market] sales." ITA R. 261.

Some portion of the claimed expenses may be related directly to the sales under consideration. But these adjustable expenses are not segregated from expenses more properly attributable to research and developing good will and future sales. This "indiscriminate lumping together [is impermissible]. ... [I]t must be shown that each claimed expense had a reasonably direct effect upon the sales in the market under consideration." *F.W. Myers & Co.,*

*Inc. v. United States*, 72 Cust.Ct. 219, 233, 376 F.Supp. 860, 872 (1974). Therefore, the court finds the ITA determination that the technical expenses claimed as an adjustment were not directly related to the sales under consideration was based on substantial evidence in the record and was in accordance with law.

Alternatively, plaintiffs contend that even if these expenses are not directly related to the sales under consideration, plaintiffs are entitled to a full adjustment for all the costs of technical services under 19 C.F.R. § 353.15(c).[46] This regulation [the ESP offset] requires the ITA to adjust the foreign market value downward to compensate for all expenses generally related to sales. The regulation applies only in cases where dumping margins are determined by comparing the foreign market value with the exporter's sales price as opposed to the purchase price in the United States. 19 C.F.R. § 353.15(c). However, under the regulation, the ESP offset is limited to the extent a similar adjustment in the United States market reduces the exporter's sales price [the ESP offset cap]. Plaintiffs contend that this cap is invalid because it is unreasonable and contrary to the antidumping laws.[47]

The ITA calculates dumping margins based on the exporter's sales price in cases where the exporter and the importer are related entities. In such cases, the product at issue is not sold in an arms length transaction until the importer sells to an unrelated entity in the United States. To calculate the exporter's sales price, the ITA determines the price the importer charged to the unrelated entity, and then adjusts for a variety of expenses to determine the price actually received by the manufacturer.

---

46. 19 C.F.R. § 353.15(c) reads in relevant part:
 In making comparisons using exporter's sales price, reasonable allowance will be made for all actual selling expenses incurred in the home market up to the amount of the selling expenses incurred in the United States market.

47. This issue was not presented to the ITA, but the court allowed plaintiffs to amend their pleadings to raise it here for the first time. *Rhone Poulenc S.A. v. United States*, 7 C.I.T. ——, 583 F.Supp. 607 (1984).

One of the adjustments required is a reduction in the exporter's sales price to compensate for "expenses generally incurred by or for the account of the exporter in the United States in selling identical or substantially identical merchandise." 19 U.S.C. § 1677a(e)(2). If a similar adjustment is not allowed for sales in the home market, then dumping margins would not be calculated on a fair basis. The exporter's sales price would be reduced to compensate for general selling expenses, but no parallel reduction would apply in the home market. This could lead to unfairly high dumping margins, or even a finding of less than fair value sales when sales in the United States were at prices no less than that charged in the home market.

■ The ESP offset is intended to prevent unfair comparisons by allowing an adjustment that reduces the foreign market value by "all actual selling expenses incurred in the home market." 19 C.F.R. § 353.15(c). This adjustment is not expressly required by statute. But the adjustment is proper since it is within the scope of administrative discretion and it furthers one of the primary goals of the antidumping law, the law "expressly requires a fair comparison." *Smith-Corona Group v. United States*, 713 F.2d at 1578.

The Federal Circuit affirmed the validity of the ESP offset in *Smith-Corona*. But the court there did not rule on whether the offset was properly subject to the cap limiting the offset to the amount of the adjustment for the selling expenses in the United States. *Id.* at 1579. Plaintiffs contend that the cap is contrary to the purposes of the antidumping laws. Defendants contend that the cap should be upheld because it provides a fair basis for comparison and because the court should defer to the ITA's expertise in administering the antidumping laws.

"When the issue is the validity of a regulation issued under a statute an agency is charged with administering, it is well established that the agency's construction of the statute is entitled to great weight." *Melamine Chemicals, Inc. v. United States*,

732 F.2d 924, 928 (Fed.Cir. (1984). The ESP offset cap must be sustained unless it is "unreasonable and plainly inconsistent with the statute ...." *Id.; Smith-Corona Group v. United States*, 713 F.2d at 1575. Congress has delegated substantial discretion to the ITA in the administration of the anti-dumping laws. But Congress has established general standards to guide the agency "and these must be followed. The ... [ITA] cannot, under the mantle of discretion, violate these standards or interpret them out of existence." *Id.* at 1571.

The validity of the ESP offset cap is directly reviewed in *Silver Reed*. There the court held that the cap is invalid because it is contrary to the purposes of the antidumping laws. The antidumping law requires adjustments to the foreign market value and United States price " 'so that value can be fairly compared on an equivalent basis.' " *Silver Reed America, Inc. v. United States*, 581 F.Supp. at 1293, *quoting Smith-Corona Group v. United States*, 713 F.2d at 1572. "Obviously, application of the cap thwarts a fair comparison ... to the extent that fixed selling expenses must be deducted from the United States price ... but deduction of similar selling expenses in the home market is arbitrarily limited." *Silver Reed America, Inc. v. United States*, 581 F.Supp. at 1295.

While *Silver Reed* is not binding on this court, the opinion in *Silver Reed* persuasively articulates this court's concerns with the fairness of the ESP offset cap. It is basically unfair to reduce the exporter's sales price for all selling expenses incurred in the export market without allowing a reduction for all selling expenses in the home market. If the exporter's sales price is determined absent all selling expenses, so must the foreign market value in order to provide the fair basis for comparison that is fundamental in determining whether dumping has occurred. This rationale justified the ESP offset in *Smith-Corona*. The same logic requires the court to invalidate the artificial restriction on the ESP offset contained in the cap. The ITA does not have discretion to ignore the basic prin-

ciple behind the antidumping law in making the calculations that determine whether sales are at less than fair value.

At this point, ordinarily the court would remand this matter to the ITA for redetermination of whether plaintiffs made sales at less than fair value.[48] In light of the pending appeal in the *Silver Reed* case, the court finds this would be an inefficient use of administrative resources. The decision of the Court of Appeals may modify the result in this case.

**THEREFORE IT IS ORDERED:** Plaintiffs' motion to set aside the determination of the International Trade Commission is denied. Plaintiffs' motion to set aside the determination of the International Trade Administration is granted. Remand to the ITA is stayed pending the decision of the Court of Appeals for the Federal Circuit in *Silver Reed America, Inc. v. United States*, No. 84–1118 (Fed.Cir. April 26, 1984).

---

**48.** It is unclear whether the ITA found that plaintiffs' claimed expenses were all generally related to sales for purposes of the ESP offset. The ITA must make that determination on remand.