BANDO CHEMICAL INDUSTRIES, LTD. AND
BANDO AMERICAN INC., PLAINTIFFS *v.* UNITED STATES, DEFENDANT

Court No. 89-07-00399

PIRELLI TRASMISSIONI INDUSTRIALI, S.P.A. AND PIRELLI
INDUSTRIAL PRODUCTS CORP., PLAINTIFFS *v.* UNITED STATES, DEFENDANT

Court No. 89-07-00430

(Decided August 6, 1993)

*Gibson, Dunn & Crutcher (Joseph H. Price, Donald Harrison, Naoyuki Agawa* and *Sharon T. Maier)* for plaintiffs Bando Chemical Industries, Ltd. and Bando American Inc.
   *Barnes, Richardson & Colburn (Matthew T. McGrath* and *Peter L. Sultan)* for plaintiffs Pirelli Trasmissioni Industriali, S.p.A. and Pirelli Industrial Products Corporation.
   *Frank W. Hunger,* Assistant Attorney General; *David M. Cohen,* Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice *(Marc E. Montalbine)* for the defendant.
   Office of the General Counsel, U.S. International Trade Commission *(Lyn M. Schlitt, James A. Toupin* and *George Thompson)* also for the defendant.
   *Stewart and Stewart (Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Jessica Wasserman* and *Patrick J. McDonough);* and *James E. Nelson, Esq.,* The Gates Rubber Company, of counsel, for the intervenor-defendant.

MEMORANDUM

AQUILINO, *Judge:* In Slip Op. 92-26, 16 CIT 133, 787 F. Supp. 224 (1992), familiarity with which is presumed, this court granted in part motions of the above-named plaintiffs focused on the affirmative determination of the International Trade Commission ("ITC") *sub nom. Industrial Belts from Israel, Italy, Japan, Singapore, South Korea, Taiwan, The United Kingdom, and West Germany,* 54 Fed.Reg. 24,430 (June 7, 1989). In particular, the motions challenge the determination insofar as it is based on the views of Commissioner David B. Rohr, who concluded that material injury did not exist but that the domestic industries producing V-type and synchronous-type power-transmission belts are threatened with such injury by reason of imports from Italy and Japan found by the International Trade Administration, U.S. Department of Commerce ("ITA") to be sold in the United States at less than fair value and also that the domestic industry producing all other types of power-transmission belts is threatened with material injury by reason of imports from Japan found by the ITA to be sold at less than fair value.[1]

---

[1] *See Industrial Belts from Israel, Italy, Japan, Singapore, South Korea, Taiwan, The United Kingdom, and West Germany,* USITC Pub. 2194, pp. 25-26 (May 1989) (Views of Commissioner David B. Rohr). These views on threat, derived, as indicated, by analytical subdivision of the overall domestic industry and coupled with determinations of actual injury by Commissioners Eckes and Newquist, constituted an affirmative final determination of material injury by the ITC under 19 U.S.C. § 1677(11), Chairman Brunsdale, Vice Chairman Cass and Commissioner Lodwick dissenting. *See* 54 Fed.Reg. at 24,430-31. *See generally MBL (USA) Corporation v. United States,* 16 CIT 108, 787 F.Supp. 202 (1992).

I

In Slip Op. 92–26, the court concluded that the respective motions had to be granted, "at least to the extent that the underlying proceedings be remanded to the ITC to enable Commissioner Rohr to reflect on, and explain further, his views". 16 CIT at 137, 787 F.Supp. at 227. The remand was based, in part, upon reasoning that the commissioner is presumed to have considered all of the relevant factors regarding determination of threat of material injury, including those listed in 19 U.S.C. § 1677(7)–(F)(i), but that that

> presumption alone * * * is not enough to sustain his determination—it must have a reviewable, reasoned basis. *See, e.g., A. Hirsh, Inc. v. United States,* 14 CIT 23, 25, 729 F.Supp. 1360, 1362 (1990), *aff'd,* 948 F.2d 1240 (Fed.Cir. 1991), and cases cited therein. As explained in *Asociacion Colombiana de Exportadores de Flores v. United States,* 12 CIT 1174, 1177, 704 F.Supp. 1068, 1071 (1988), that an
>
>> administrative agency may make varying decisions based on the facts of particular cases does not permit the agency to act arbitrarily. In order to ascertain whether action is arbitrary, or otherwise not in accordance with law, reasons for the choices made among various potentially acceptable alternatives usually need to be explained.
>
> In the cases at bar, the court is unable to determine, for example, either why the commissioner chose to discount the points raised by Bando or the data upon which he relied in reaching his determination as to Italy. In short, he seems to have failed to articulate a "rational connection between the facts found and the choice made." *Bowman Transportation, Inc. v. Arkansas-Best Freight Systems, Inc.,* 419 U.S. 281, 285 (1974), quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962).

16 CIT at 136–37, 787 F.Supp. at 227. Such articulation is particularly important here because "the projection of future events is necessarily more difficult than the evaluation of current data". *Yuasa-General Battery Corp. v. United States,* 12 CIT 624, 628, 688 F.Supp. 1551, 1555 (1988), quoting H.R. Rep. No. 1156, 98th Cong., 2d Sess. 174 (1984).

A

In compliance with the court's order, Commissioner Rohr has now filed extensive views[2], based to a significant degree on confidential business proprietary information contained in the ITC's administrative record. At the outset, the commissioner explains the brevity of his original, reported reasoning as follows:

> This remand points up a * * * broad issue with respect to Commission decisions. The Court, in finding my determination to be without substantial evidence, made a point of the brevity I used in summarizing the evidence that I felt supported each of the twenty-

[2] They will be cited hereinafter as "Views on Remand".

four determinations I found necessary for each of the separate countries and separate products in the original investigations. The court recognized that my brevity was conditioned by the problem of confidentiality. The court contrasted my decision to treat information in general terms with some of my colleagues' decisions to prepare confidential opinions.

My desire to write a nonconfidential opinion required me to state, in the simplest and most general of terms, the essentials of the foreign capacity, import market shares, and pricing information that I felt were sufficient to form the basis for affirmative and negative threat findings. I did not address many of the specific arguments raised by these plaintiffs in their appeals, or by other parties in the proceedings before the Commission, not because I did not consider them, but rather because, having considered them, I did not feel them to be persuasive, or to detract from the affirmative evidence, or because to answer them would involve disclosure of confidential data.

I continue to believe that as a matter of policy the Commission should not prepare confidential opinions. However, for purposes of this remand, I have concluded that there is no possibility that I can satisfy the Court's requirement for me to address the arguments, made by plaintiffs in their appeals, in these remand determinations without an extensive review and explanation of confidential information. I have therefore reluctantly decided to prepare a confidential version of this opinion.

Views on Remand, pp. 2–3 (footnote 6 omitted). Footnote 7 to this explanation adds:

A title VII investigation by the Commission is not like a private dispute between two private parties. It is important that the public be aware to the greatest extent possible the reasons for our decisions. The choice then comes down to whether a statement such as "Production * * * from * * * in 1986 to * * * in 1987 * * * in 1988 for a * * * percent * * * over the period of investigation" is more or less illuminating to the public than the statement "The production indicators provide only a little support for an affirmative determination." I believe the latter, because it indicates how the "facts" fit into a conclusion, is better. That is why I choose that format. I recognize that not all of my colleagues share this view.

Be this difference in approach on the part of members of the ITC as it may[3], Commissioner Rohr concludes anew on remand that

all three domestic industries are threatened with material injury by reason of imports from Japan. I determine that the V-Belt and Synchronous Belt industries are threatened with material injury by reason of Italian imports. I find the All Other Belt industry is not

---

[3] Of course, the court, which is also privy to the business proprietary information on the record, is confronted with the same concerns as to confidentiality. In these cases, the court has necessarily reviewed that information but has decided, in view of the nature of the issue at bar, to render this memorandum without disclosure of those data and hence a nonpublic version.

materially injured nor is it threatened with material injury by reason of Italian imports.

* * * I find the threats to be real and imminent. My findings * * * that none of the three industries are currently experiencing material injury does not mean * * * that I am finding these industries to be "healthy." It also does not mean that the industries are not being affected, even adversely affected, by imports. Each of the industries was experiencing declines in certain key indicators. My finding was merely a conclusion that the declines had not reached a level * * * properly characterized as "material injury."

* * * I am concluding that all three industries are relatively close to a level of material injury, the closest being the V-Belt industry and the farthest being the All Other Belts industry. My conclusions * * * are that the impact of V-Belts imports from the two countries under consideration at this time are likely to be small but continuingly adverse and sufficient to push the industry over the line into material injury within a very short, i.e. imminent time frame. I conclude that the impact of Synchronous Belt imports are likely to be somewhat greater and sufficient to push the somewhat stronger Synchronous Belt industry into a condition of material injury. Finally, while I find the All Other Belts industry to be the least close to the material injury characterization by the end of the period of investigation, the impact of imports is likely to be strongest and so I conclude that the threat posed by the LTFV imports to that industry is also real and imminent.

With respect to the issue of material injury "but for" the suspension of liquidation, I reaffirm my original determination that there is insufficient evidence for me to conclude that there would have been material injury to any of these industries by reason of imports but for the suspension of liquidation as to entries of those imports after the Commerce preliminary determination.[4]

The commissioner comes to these conclusions after discussing first the "vulnerability" of the industries, then the above-referenced factors of 19 U.S.C. § 1677(7)(F)(i) and finally specific issues raised by the plaintiffs in regard to the remand. Stating that his original views did not encompass a finding regarding the vulnerability of the industries[5], Commissioner Rohr now believes "that a more explicit examination of the vulnerability of the industries is useful."[6] With regard to V-belts, the commissioner reasons that the "very nature of the mixed indicators and the very close question of whether the data actually describe [ ] an industry experiencing material injury clearly point to the considerable vulnerability of this industry."[7] As for synchronous belts, he views that industry as "somewhat stronger than the V-Belt industry, yet it, too, is in a state in which the effects of imports would not have to be very great to

---

[4] Views on Remand at 26–27.
[5] *Id.* at 4.
[6] *Id.* at 5.
[7] *Id.* at 6–7.

push it into a condition of material injury."[8] Lastly, Commissioner Rohr concludes that the industry for all-other belts "seems to be the least vulnerable but also is displaying at least some vulnerability to the effects of imports."[9]

In addition to discussing at length, as indicated, the statutory factors in regard to threat of material injury emanating from the plaintiff exporters in Japan and Italy, the commissioner also responds to specific issues raised as to Japan, to wit, the opening of production facilities in the United States, the reported capacity utilization rate of plants in Japan, the volume of Japanese imports, the stated intentions of producers in Japan vis-à-vis the U.S. market, the reported data on inventory of the Japanese merchandise, and the available data on pricing of the exports from Japan. None of these points caused Commissioner Rohr to waiver in his views as to the existence of threat.

B

The commissioner's supplemented reasoning has not caused the plaintiffs to waiver either in their respective views that he has missed the mark required to affirmatively find threat of imminent material injury. The plaintiffs Bando conclude that Commissioner Rohr's views amount to the "kind of 'conjecture' and 'supposition' that the ITC has been admonished by Congress to avoid."[10] The Pirelli plaintiffs complain, among other things, that the commissioner

> has chosen to make new affirmative threat determinations. He has de-emphasized some of the factors on which he previously relied for his affirmative determinations, and has introduced new factors which were previously not discussed. Commissioner Rohr's analysis of the statutory threat factors on remand continues to be flawed by substantial errors as to the evidence on the record.

Plaintiffs' Post-Remand Brief, p. 2.

II

In pressing their claims, the plaintiffs recognize, as they must, that the "Commission has discretion in interpreting the information before it." *Id.* at 3. This is particularly appropriate when threat, which Congress has seen fit to require the ITC to consider, is the issue. And the statutory standard for judicial review of an ITC determination is whether it is supported by substantial evidence on the record and is otherwise in accordance with law. 19 U.S.C. § 1516a(b)(1)(B). Such review does not extend beyond determining whether the Commission has acted within its delegated authority and has correctly interpreted and applied the law. The court may not weigh evidence concerning specific factual findings nor may it substitute its judgment for that of the ITC. In short, the plaintiffs have a difficult burden of showing that the challenged de-

---

[8] *Id.* at 8.

[9] *Id.* at 9–10.

[10] Comments of Plaintiffs on Remand Views of Commissioner Rohr [hereinafter "Bando Brief"], p. 37.

termination is unsupported by substantial evidence or not in accordance with law.

Notwithstanding these standards for judicial review, the plaintiffs argue over the record evidence at length.[11]

### A

Each complains that Commissioner Rohr improperly considered the vulnerability of the domestic industry, arguing that this is not contemplated by the statute and that the "undefined and subjective nature of the concept of vulnerability makes it of little help to a reviewing court." Bando Brief at 8.

The commissioner explains that it is his habit to first assess the vulnerability of the domestic industry in question before evaluating data regarding likely imports. *See* Views on Remand at 4–5. The defendant admits that vulnerability is not specified in the governing statute but cites *The Calabrian Corp. v. U.S. Int'l Trade Comm'n,* 16 CIT 342, Slip Op. 92–69 (May 13, 1992), to the effect that consideration of this phenemenon has been upheld. *See also Metallverken Nederland, B.V. v. United States,* 13 CIT 1013, 1029, 728 F.Supp. 730, 742 (1989); *Anhydrous Sodium Metasilicate From France,* 46 Fed.Reg. 176, 179 (Jan. 2, 1981) (additional views of Commissioner Stern discussing the vulnerability of the domestic industry).

In concluding that the domestic industry is vulnerable, Commissioner Rohr is merely taking a first step in considering whether or not threat exists. The plaintiffs do not show that, in assessing domestic susceptibility, the commissioner has failed to follow the statutory requirements or has overstepped the ITC's parameters. He "need not use the precise statutory language in his findings as long as the basis of his determination is reasonably discernable." *Metallverken Nederland B.V. v. United States,* 13 CIT at 1036, 728 F. Supp. at 747, citing *Negev Phosphates, Ltd. v. U.S. Dep't of Commerce,* 12 CIT 1074, 1083, 699 F. Supp. 938, 947 (1988), *Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1218, 704 F. Supp. 1075, 1094 (1988), *American Spring Wire Corp. v. United States,* 8 CIT 20, 23, 590 F. Supp. 1273, 1277 (1984), *aff'd sub nom. Armco, Inc. v. United States,* 760 F.2d 249 (Fed. Cir 1985), and *British Steel Corp. v. United States,* 8 CIT 86, 98, 593 F. Supp. 405, 414 (1984).

The plaintiffs argue that Commissioner Rohr's conclusions that the domestic V-belt industry is considerably vulnerable[12] and "certainly heading for material injury"[13] are at odds with earlier statements by him regarding the state of that industry. Pirelli Plaintiffs' Post-Remand Brief at 5–6. Similarly, the conclusion that the synchronous-belt industry, while healthier than that for the V-belts, is nevertheless "in a state

---

[11]The quality of their written presentations, as well as of those in opposition, has obviated any need for oral argument.

[12]Views on Remand at 7.

[13]*Id.*

in which the effects of imports would not have to be very great to push it into a condition of material injury"[14] is allegedly based on erroneous analysis of the industry's financial condition and market share. *See id.* at 6–8.

The assessment of the state of the domestic industry vis-à-vis foreign threat does not require, however, that it be "near the brink of material injury", to borrow the Pirelli plaintiffs' words. To conclude, as Commissioners Eckes and Newquist have herein, that that industry is now experiencing material injury by reason of investigated imports is necessarily based on perception of the present. With regard to threat, on the other hand, the ITC considers the current situation with an eye towards the future. This is not the same perspective and may not lead to conclusions reached about material injury to the domestic industry now.

In any event, this court cannot conclude that Commissioner Rohr's initial focus was proscribed by law or that the record is devoid of substantial evidence indicating that the domestic subindustries of that focus are susceptible to material injury by reason of foreign imports.

## B

According to statute, the relevant economic factors which the ITC shall consider in determining whether an industry in the United States is threatened with material injury by reason of imports include, but are not limited to:

> (II) any increase in production capacity or existing unused capacity in the exporting country likely to result in a significant increase in imports of the merchandise to the United States,
> (III) any rapid increase in United States market penetration and the likelihood that the penetration will increase to an injurious level,
> (IV) the probability that imports of the merchandise will enter the United States at prices that will have a depressing or suppressing effect on domestic prices of the merchandise,
> (V) any substantial increase in inventories of the merchandise in the United States,
> (VI) the presence of underutilized capacity for producing the merchandise in the exporting country,
> (VII) any other demonstrable adverse trends that indicate the probability that the importation (or sale for importation) of the merchandise (whether or not it is actually being imported at the time) will be the cause of actual injury,
> (VIII) the potential for product-shifting if production facilities owned or controlled by the foreign manufacturers, which can be used to produce products subject to investigation(s) under section 1671 or 1673 of this title or to final orders under section 1671e or 1673e of this title, are also used to produce the merchandise under investigation[.]

19 U.S.C. § 1677(7)(F)(i). Furthermore,

---

[14] *Id.* at 8.

[a]ny determination by the Commission under this subtitle that an industry in the United States is threatened with material injury shall be made on the basis of evidence that the threat of material injury is real and that actual injury is imminent. Such a determination may not be made on the basis of mere conjecture or supposition.

19 U.S.C. § 1677(7)(F)(ii).

In reaffirming his determination that the domestic V-belt and synchronous-belt industries are threatened with material injury by reason of imports from Japan and Italy, Commissioner Rohr examines the foregoing factors on the record.

### (1)

The commissioner considers increased production capacity or unused capacity in those two countries to be significant factors in support of his determination. Bando and Pirelli challenge his analysis, each on different grounds.

### (a)

In regard to Japan, Commissioner Rohr concludes that capacity is not a realistic limit to production. *See* Views on Remand at 20. He examines production and capacity to calculate capacity utilization ratios. Bando points out that the production used in his analysis encompasses automotive belts, which are not subject to the administrative proceedings at bar, and that the production of industrial belts is actually significantly lower than that relied upon on remand. They add that the change in the number of industrial belts produced from 1986 to 1988 was markedly different from that of automotive belts during the same period. Furthermore, the plaintiffs contend that shipments in the home market mirrored change in production. Therefore, the number of belts available for export was unchanged, and increased production is not a factor supporting a threat determination. Similarly, the commissioner's analysis of Japanese capacity includes production of automotive belts. The plaintiffs contend that the actual percentage of capacity increase for industrial belts is lower than the aggregate figure relied upon. In addition, they claim that home-market demand for that product far exceeded the increase in capacity, providing further support for the proposition that exports are not likely to increase.

It is true that Commissioner Rohr relied in part upon aggregate data in reaching his conclusion that capacity was not a limit on production, pointing to the trend in increased production and capacity utilization as likely to result in a significant increase in exports to the United States. However, the commissioner also considered production figures of industrial belts alone, and those figures tend to support his conclusion, albeit to a lesser extent. *Cf. id.* at 20, n. 63. Furthermore, the defendant argues that automotive-belt production was examined as an indicator of what the industry is capable in the production of power-transmission belts,

challenging plaintiffs' position regarding the level of operations as compared with normal capacity. The question then becomes whether shifts in production are likely to result in increased exports and, if so, if such exports would be directed to the U.S. market.

Bando argues that increased demand in the home market affected capacity-utilization rates, which were, in turn, incorrectly relied upon by Commissioner Rohr as support for the perception that Japanese producers are able and likely to increase exports to the United States. The plaintiffs point out that, in order to meet demand for belts in the home market, the plants there required overtime by their workers. The ability to shift production is only temporary and not an indication that Bando is able to sustain capacity at those levels.[15] Furthermore:

> Bando has faced a demand for more belts than it can produce in its customary mode of two shifts of employees working seven hours per day, five days per week. Adding a third shift is not a viable alternative * * * because it would require hiring additional workers; as a matter of Bando policy, such additional workers could not be discharged if demand slowed, but instead would be retained until retirement. Bando has therefore responded to the need for additional output by asking its employees to work on the average of two to two and one half extra hours per day during the normal work week and to work full seven hour days on many Saturdays which would otherwise be holidays. Bando has therefore been able to operate substantially in excess of its normal capacity.

Bando Brief at 11–12, quoting Bando's ITC Post-Hearing Brief at Attachment D. That is, the data and explanation of Japanese hiring practices "depict an industrial belts industry operating at its limits, straining just to keep up with * * * domestic demand." *Id.* at 12. "Companies, such as the Japanese producers in this case, which are operating * * * through the use of overtime and other means just to keep up with * * * home market demand, will not pose an imminent export threat to U.S. industries." *Id.* at 14. The plaintiffs urge this court to reject Commissioner Rohr's approach as arbitrary and in disregard of the evidence at hand, which does not support the notion that the increased production was likely to lead to increased exports.

The defendant points out that the issue is not whether the explanation for capacity utilization is reasonable, rather whether it supports the view that it is a limitation on the ability to produce.

Here, Commissioner Rohr focuses on the ability of Japanese producers to exceed stated capacity and determines that that capacity has not curtailed production. There is support for this conclusion, notwithstanding plaintiffs' foregoing explanation of the reasons for operating at excess levels. Moreover, 19 U.S.C. § 1677(7)(F)(i)(II) provides for the consideration of current increased production or existing unused capacity in determining the likelihood of increased exports of the merchan-

---

[15] The court notes in passing, however, that the record shows those levels to have been sustained for a number of years.

dise to the United States. Thus, although the plaintiffs correctly point out that either under- or over-utilization of current capacity may be used as evidence of potential for such exports, either approach is still in accordance with law.

The plaintiffs view the figures relating to percentage of exports relied upon by Commissioner Rohr as being of "little significance". Bando Brief at 15. They point to the changing percentage of shipments in the home market as tending to disprove the likelihood of increasing exports to the United States. Bando rejects the commisioner's conclusion regarding the change in percentages of total Japanese production being exported to the United States. The plaintiffs claim that, using the same data presumably relied upon by Commissioner Rohr, which includes automotive belts, the actual percentages from 1986 to 1988 are contrary to the percentages now cited by him. They state that the same results obtain using data for power-transmission-belt production and export only. They claim the change in the percentage being exported during the last year of the period of investigation is significant evidence that any threat of material injury is not imminent as required by 19 U.S.C. § 1677(7)(F)(ii).

Nevertheless, the percentages both by unit and value do not mirror the change with regard to total production for that year and, in fact, support the commissioner's conclusion regarding the significance for the U.S. market. Also, even accepting the percentages pressed by the plaintiffs, the overall trend for the period of investigation supports Commissioner Rohr's conclusion that the results of any increased production are likely to be for the U.S. market.

(b)

With regard to Italy on the other hand, the commissioner considers unused capacity to be important in determining that producers in that country are able to increase their level of production. His examination of Italian export data indicates a likelihood that additional product would be exported to the U.S. market. *See* Views on Remand at 11–12.

The Pirelli plaintiffs question such a view insofar as based on production by unit rather than by weight. While their plea for consideration of weight rather than unit data is not without merit[16], there is no showing that Commissioner Rohr's decision to rely on unit production is not supportable. While acknowledging plaintiffs' preference, the commissioner then explains his choice that "it is units of belts not the weight of the belts which impacts the U.S. market and U.S. industry." *Id.* at 17 and n. 56. According to defendant's counsel, this weight-versus-unit issue was thoroughly aired at the administrative level.

---

[16]In support of their argument, the plaintiffs point out that,

[a]ccording to Commissioner Rohr's reasoning, the sale of 10 sewing machine belts for $1 each (a total of $10) would be more significant—in fact, ten times as significant—than the sale of one mining machinery belt for $500. Clearly, this does not make sense from a commercial standpoint. For a product like industrial belts, which comes in so many different sizes and unit values, weight is a better production capacity indicator than units.

Pirelli Plaintiffs' Post-Remand Brief, p. 9.

The plaintiffs point out that, even on a unit basis, the Italian production capacity figures did not change significantly during the period of investigation. They point to capacity utilization figures as evidence that the industry is "operating at nearly full, or perhaps even full, capacity". Pirelli Plaintiffs' Post-Remand Brief at 10. Therefore, they argue, there was little or no ability to increase exports to the United States. The plaintiffs state that Commissioner Rohr focuses on theoretical capacity rather than accepting that current capacity data do not support his finding of threat of material injury. They claim that it is "unreasonable to assume that Pirelli could and would produce to its full theoretical capacity" and that it is "well known that at about 80 to 85 percent of capacity utilization, firms begin to reach capacity constraints notwithstanding the theoretical excess capacity available". *Id.* at 11. However, the Pirelli plaintiffs do not provide support for these contentions nor do they show that Commissioner Rohr has acted arbitrarily in determining that, given the current capacity-utilization figures in the record, Italian producers are both able and likely to increase the level of exports to the United States. They do suggest that the commissioner may be thinking of the particular circumstances in Japan, which provide both the opportunity and the incentive to operate above full capacity, and claim that such conditions do not exist in Italy. However, it is clear in Commissioner Rohr's expanded views that his conclusion regarding Italy is not based on ability to produce above full capacity, rather it is based on existing unused capacity. He notes that, even given the trend in capacity utilization in Italy during the period of investigation, there remains capacity to produce belts which is significant compared to the number currently exported to the United States. *See* Views on Remand at 11.

Commissioner Rohr finds a sufficient likelihood that additional product would be sent to the United States. He relies on the trend in Italian exports to this country during the period of investigation, both in total volume and as a percentage of imports. The plaintiffs assert that the commissioner relies on the wrong data in reaching his conclusion. The figure he cites as the potential unit production by unused capacity reflects both industrial and automotive belts and therefore a greater potential production than realistically exists for the former kind alone. The plaintiffs argue that only half the number cited by Commissioner Rohr is realistic[17] and then point out that only a percentage of that figure can be assumed to be directed at the U.S. market. Therefore, he wrongly calculated both the total number and the percentage thereof of potential production via unused capacity. Furthermore, the plaintiffs contend that, when viewed independently, the exports of industrial belts paint a different picture than Commissioner Rohr's. They indicate that the trend, both in terms of exports to the United States as a percentage

---

[17] In their post-remand brief, they explain why capacity and capacity utilization data were reported as an aggregate. In support of their allocation of the percentage of the data which can be attributed to the production of industrial belts, they point to confidential document 44, p. a–177, which provides data for the production of belts in 1988.

of total exports and as a percentage of total production, does not lend support for the commissioner's assertion regarding the change in Italian exports to the United States during the period of investigation. *See* Pirelli Plaintiffs' Post-Remand Brief, pp. 14–15. They note particularly that the change in exports from 1987 to 1988, the last year of that period, presents the least support for his conclusion. Further:

> Commissioner Rohr recognized elsewhere in his remand determinations the obvious fact that the more recent data, at the end of the period of investigation, is especially significant. In discussing Japanese production data, [he] stressed that "the largest portion of this [change occurred] in the last year of the investigation."

*Id.* at 15, n. 6. The commissioner should therefore have placed greater weight on the export figures for 1987–1988 than for 1986–1987 "because [they] represent[ ] the most recent data, which is the most indicative of future trends." *Id.* at 15 (footnote omitted). The plaintiffs note that the overall change in Italian exports of industrial belts was "not as dramatic as Commissioner Rohr makes out." *Id.*

Suffice it to state that the commissioner's reference to the last year does not mean that a view as to the entire period of investigation is impermissible.

(2)

Commissioner Rohr considers there to be a likelihood that market penetration will increase injurious level. *See* Views on Remand at 12–14, 20–21. Regarding Japan, his analysis of the data recognizes that there is stronger support for this perception in the "All Other" category than for V-belts or synchronous belts. Considering that the domestic V-belt and synchronous belt industries have been determined to be more susceptible to injury than the all-other segment, the corresponding relationship of the Japanese import penetration ratios is found by the commissioner to support an affirmative determination for all three categories.

After examining the import penetration ratios for Italy, Commissioner Rohr determines that the

> level of market penetration in absolute terms, particularly in the V-Belt industry, provides only slight support for an affirmative, although as I have stated I must look at these in the context of the other imports that I found to be threatening the industry. The [changes] in the V-Belt and Synchronous categories provide relatively stronger support.

*Id.* at 13–14. The commissioner concludes that his original decision that the data provide support for an affirmative threat determination remains appropriate.

The Bando plaintiffs counter that current penetration by Japanese imports was not significant enough to support an affirmative present material injury determination. They argue that the conclusion that a continuing trend of changes in import penetration would become injurious is unsupported by the record and that, in fact, "the evidence that has

been presented actually points in the opposite direction, *i.e.*, to a decrease in import penetration levels in the future." Bando Brief at 18.

However, that import penetration ratios do not support a present material injury determination does not necessarily mean that they do not support a finding of threat of material injury. Evidence of present harm is not necessary for a finding that injury is threatened. *E.g., Rhone Poulenc, S.A. v. United States,* 8 CIT 47, 52, 592 F.Supp. 1318, 1323–24 (1984). The purpose of examining current import penetration ratios is to determine the rate of increase, not necessarily the actual degree of penetration. Thus, for example, a very minor percentage of penetration which doubled from one year to another during the course of an investigation could portend future such increases which would materially injure the domestic industry. Moreover, as the defendant points out, Commissioner Rohr considered combined import penetration from Italy, Japan and Singapore for V-belts, and from Italy and Japan for synchronous belts. The combined data provide support for the commissioner's conclusion that market penetration may increase to injurious levels.

Bando asserts that, in not accepting the plaintiffs' stated intent to reduce further exports to the United States, Commissioner Rohr "failed to take into account 'whatever in the record fairly detracts from its weight.'" Bando Brief at 23, quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951). However, the commissioner does consider, and then rejects, this intent. *See* Views on Remand at 25. Moreover, he was required only to consider evidence on the record and to render his determination based on a fair evaluation of that evidence. "Absent some showing to the contrary, the Commission is presumed to have considered all evidence in the record." *Rhone Poulenc, S.A. v. United States,* 8 CIT at 55, 592 F.Supp. at 1326.

The Pirelli plaintiffs take the position that, given the penetration levels, particularly for V-belts, "the likelihood that they would increase to injurious levels was remote at best, and the threat of injury was in no way 'real' and 'imminent.'" Pirelli Plaintiffs' Post-Remand Brief at 18. But the real-and-imminent standard applies to the threat of material injury perceived as a whole, not as to each individual factor considered. Commissioner Rohr does note in his views on remand that the level of import penetration from Italy provides only slight support for his affirmative determination and that, even combining the data, only moderate support is indicated. What is significant here, to repeat what has already been stated above, is that the trend in import penetration nevertheless supports an affirmative determination. The degree of that support is important only when determining whether the commissioner's determination, reviewed in its entirety, is supported by substantial evidence on the record. Indeed, as the plaintiffs themselves point out, import penetration data must be analyzed in light of other factors. *See id.* at 22–24.

The Pirelli plaintiffs criticize Commissioner Rohr's decision to examine combined import penetration figures, calling it "informal cumulation." *Id.* at 24. They point to his explanation in his original determination that he does not generally utilize formal cumulation in threat cases and also that he "did not note 'the impact of other unfairly traded imports' in his discussion of the Italian case." *Id.* at 25, citing public document 308, pp. 45–46. They call his decision, after remand, to consider the cumulative effect of imports "arbitrary and an abuse of his discretion". *Id.* at 27.

However, such an approach has been held permissible. *See, e.g., Asociacion Colombiana de Exportadores de Flores v. United States,* 12 CIT 634, 642, 693 F.Supp. 1165, 1172 (1988). Furthermore, if a commissioner were unable to revise his analysis on remand, that route following judicial review would be devoid of purpose. Finally, the figures for Italy standing alone provide support for the commissioner's determination, independent of the combined data. The court further notes that he analyzes cumulative data independently of his analysis of market penetration, choosing instead to categorize that analysis pursuant to 19 U.S.C. § 1677(7)(F)(i)(VII), to wit, "any other demonstrative adverse trends that indicate the probability that the importation * * * of the merchandise * * * will be the cause of actual injury."

(3)

In his analysis of Japanese pricing practices, Commissioner Rohr points out that he

> did not place great weight on pricing information. I did not view it as particularly reliable because it was statistically based on a limited number of observations and subject to the problems detailed in the Commission's final report of this investigation. I note that it does consistently point in one direction, that of an affirmative finding which is also supported by the anecdotal evidence. While it does not have great weight, what weight the pricing data has [ ] must be added to the evidence supporting an affirmative determination.

Views on Remand at 22. Despite the commissioner's admission that this information provides but minimal support for his determination, the plaintiffs go to great lengths to refute the analysis. The court discerns little, if any, ground to be gained by discussing their contentions herein.

The situation with regard to Italy is similar, with the added difficulty that the pricing information requested by the ITC was not provided.

(4)

Commissioner Rohr examined inventory levels in Italy and Japan and concludes that they support his determination because "a build up of inventories of the imported materials * * * could, for example, increase exports to the United States, or have a price depressing or supressing effect by overhanging the market." *Id.* at 15. He explains, in reaching his conclusion based on the Japanese data, large inventories "increase

the level of supply available to be shipped to the U.S. market, whether directly or by permitting diversion of the use of production facilities for the U.S. market." *Id.* at 23.

It is true, as the Pirelli plaintiffs point out, that the statute intends that the ITC consider inventory levels in the United States. However, the statute is not exclusive in its enumeration of factors to evaulate, and the ITC has in fact taken home-market inventory data into account before. *See, e.g., Citrosuco Paulista, S.A. v. United States, supra,* 12 CIT at 1224–25, 704 F.Supp. at 1099.

### (5)

A topic Commissioner Rohr did not address in his original determination was Bando's contention that the opening of production facilities in the United States by it and another Japanese firm is evidence which strongly portends reduced imports:

> * * * It has been Plaintiffs' position throughout these proceedings that the commitment to the U.S. market represented by these new facilities—in terms of capital, personnel, marketing, and public relations—is concrete evidence of a reduced role for imports of industrial belts from Japan in the future.

Bando Brief at 32. The commissioner explains that he did consider the data relating to the new plants but "believed the allegations about displacement of imports to be too speculative". Views on Remand at 24. The plaintiffs claim that, far from being speculative, the two facilities had already begun operations by 1988. They point to their annual capacities as compared with the volume of imports from Japan and to the change in the number of belts exported to the United States from 1987 to 1988 as further support for their claim. *See* Bando Brief at 33–34.

Commissioner Rohr chooses not to rely on the "unsubstantiated allegations". Views on Remand at 24. Because the plants opened in the last year under investigation, the effect on future imports was not quantifiable. The commissioner finds that, "while the Japanese producers claimed that these new facilities would replace exports from Japan, there was no convincing evidence beyond their claims that this would in fact occur." *Id.*

### III

Reviewed as a whole, Commissioner Rohr's affirmative threat determination is supported by substantial evidence on the record and otherwise in accordance with law. That one or more of the factors considered may not support a finding of threat of material injury is not conclusive. *See e.g., Rhone Poulenc, S.A. v. United States, supra,* 8 CIT at 52, 592 F.Supp. at 1324 ("[I]n some cases, * * * one or two factors may so persuade the Commission of threat of injury that the absence of one or another will be no bar to a finding of the requisite threat").

This is not to conclude that the plaintiffs have failed to bring forth cogent reasons in support of their mutual point of view that the power-

transmission-belt industry in the United States is not threatened with real and imminent injury by reason of imports from Japan and Italy, respectively. However, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620 (1966). Commissioner Rohr, in expanding his original views after remand, shows that the affirmative determination he reaches has a reasoned basis. While the ITC has a duty to consider all the evidence before it, under the statute it is required to disclose only the findings and conclusions upon which the determination is based. *See* 19 U.S.C. § 1671d(d); *British Steel Corp. v. United States,* 8 CIT 86, 98, 592 F.Supp. 405, 414 (1984). The remand views of Commissioner Rohr now meet this requirement, and the court hereby concludes that the plaintiffs are not entitled to any additional relief on their respective motions for judgment on the ITC record and for partial summary judgment.

## IV

As indicated in Slip Op. 92–26, the plaintiffs, in the interests of orderly procedure herein, have pursued primarily their claims against the ITC and Commissioner Rohr. However, they also complain of the ITA's *Antidumping Duty Order of Sales at Less Than Fair Value; Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From Italy,* 54 Fed.Reg. 25,313 (June 14, 1989), and *Antidumping Duty Order of Sales at Less Than Fair Value; Industrial Belts and Components and Parts Thereof, Whether Cured or Uncured, From Japan,* 54 Fed.Reg. 25,314 (June 14, 1989), to the extent that suspension of liquidation occurred thereunder as of February 1, 1989, notwithstanding Commissioner Rohr's negative "but-for" determination, *supra.*

Other parties to the underlying antidumping proceedings appealed from similar resultant orders on the same ground. Those cases, docketed as CIT Nos. 89–07–00403 and 89–07–00404, led to final judgments in their favor, ordering the ITA to refund any deposits of estimated antidumping duties on imports of power-transmission-belts from Japan and Singapore entered between February 1 and June 7, 1989. *See MBL (USA) Corporation v. United States,* 16 CIT 108, 787 F.Supp. 202 (1992). The plaintiffs herein are similarly situated and thus entitled to same relief as against the ITA. Indeed, during the period of the remand to the ITC, Pirelli filed a consent motion for partial summary judgment on this issue.

In light of the foregoing affirmance of the ITC's determination after remand, the contingent relief requested by the plaintiffs against the ITA should now be granted.

Judgments will enter accordingly.